Filed 2/5/24  In re A.P. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.P. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.P. et al., <br><br> Defendants and Appellants. | F086311 <br><br> (Super. Ct. Nos. JVDP-20-000197, JVDP-20-000198) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Annette Rees, Judge.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant J.P.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant C.P.

Thomas E. Boze, County Counsel, Lindy GiacopuzziRotz, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

J.P. (father) and C.P. (mother) appeal from an order terminating parental rights to their minor children, A.P. and T.P. (the boys), pursuant to Welfare and Institutions Code section 366.26.[1] On appeal, father contends that the Stanislaus County Community Services Agency (the agency) and the Stanislaus County Juvenile Court failed in their duties of inquiry under the Indian Child Welfare Act of 1978 (ICWA).[2] Mother joins father's argument, asserting that the agency failed to satisfy its duty of further inquiry when the boys' grandfather represented that there may be distant Cherokee Nation heritage on both sides of the family. Father further contends that the agency and the juvenile court failed to enforce court-ordered visitation between him and the boys for approximately seven months, effectively depriving him of the opportunity to establish the parent-child beneficial exception to adoption.

We agree with mother and father's assertion that the agency's inquiry into the boys' potential Indian heritage was inadequate under ICWA and California law. We will therefore conditionally reverse the juvenile court's finding that ICWA does not apply and remand for further proceedings to ensure compliance with federal and state law. We affirm the trial court's order terminating mother and father's parental rights.

## FACTUAL AND PROCEDURAL HISTORY

### 1.    The Petition

On December 26, 2019, Mariposa County sheriff's deputies initiated a traffic enforcement stop after observing father driving erratically. A.P. and T.P., who were 11 and 10 years old at the time, were passengers in father's vehicle. Father was under the

---

[1] All further undefined statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Throughout this opinion, we use the term Indian in accordance with the ICWA. We recognize that other terms, including, "Native American" or "Indigenous Peoples," are preferred. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

2.

influence of methamphetamine. During a vehicle search, deputies uncovered two baggies of methamphetamine, one weighing 4.1 grams and the other weighing 18.1 grams, as well as a methamphetamine pipe. The baggies and the methamphetamine pipe were within the boys' reach. Sheriff's deputies learned that father had a felony warrant for possession of a firearm in Idaho.

Mother, who was driving behind father when he was detained, was also apprehended for driving under the influence of a controlled substance. Mother also had two minor children in her vehicle, H.P. and J.A.[3] Baggies of methamphetamine were discovered in her vehicle, as well as a methamphetamine pipe, all of which were accessible to the children.

The amount of methamphetamine in mother's and father's possession was enough to produce a high for approximately 222 people. Both mother and father were arrested and charged with child endangerment, possession of drugs and drug paraphernalia, and driving under the influence of a controlled substance. Because the children had no caregiver and no provisions for support, all four children were placed into protective custody.

On December 30, 2019, the Mariposa County Health and Human Services Agency filed a juvenile dependency petition on behalf of all four children pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (g) (no provision for support). The petition alleged that mother and father were incarcerated, and that the whereabouts of the biological fathers of J.A. and H.P. were unknown. The children were placed in the custody of their maternal grandfather and step-grandmother.

On January 21, 2019, the agency filed a jurisdiction report under section 300. The report noted that during the course of the agency's investigation, mother disclosed that

---

[3] Father is not the biological father of H.P. and J.A. Following the dependency proceedings, both children were subsequently placed in the custody of their biological fathers.

the children had observed two recent instances of domestic violence occur between her and father. One incident occurred on Thanksgiving, and the other, on Christmas Eve. During one incident, father struck mother's sister on the mouth because she was yelling at him to stop.

The report further noted that on January 10, 2020, a hair follicle drug screening was performed on mother, father, and all four children. A.P., who was then 11 years old, had methamphetamine in his system consistent with quantities detected in daily users. Mother also tested positive for methamphetamine.

## 2. Jurisdictional/Dispositional Orders

On January 29, 2020, the juvenile court held a jurisdiction hearing. With the exception of H.P.'s alleged biological father, all parents were present, including the presumed father of J.A. The parties submitted on the jurisdictional report. The court found the allegations in the petition had been proven, sustained the petition, and set the matter for a disposition hearing.[4]

On April 22, 2020, at the disposition hearing, the court declared the children to be dependents of the juvenile court and found that the children's current placement remained necessary and appropriate. Reunification services were granted to mother, father, to the alleged father of H.P., and to the presumed father of J.A.

## 3. Findings From the Status Review Hearings

On July 7, 2020, the court held a six-month status review hearing. The status review report indicated that in 2020, mother and father moved their recreational vehicle from Coulterville to Waterford in Stanislaus County. During this time, father was released from jail. Although mother was in compliance with most of her case plan requirements, she tested positive for methamphetamine in May 2020. Father was not

---

[4] The dispositional hearing was subsequently continued to allow the agency to retain an ICWA expert to complete an Indian Heritage report for J.A. and H.P., and then again, due to the COVID-19 pandemic.

compliant with most of his case plan requirements and he tested positive for methamphetamine and amphetamine in April and May of 2020. The juvenile court found that reasonable services had been provided to the parents and extended additional services to them.

On September 23, 2020, the case was transferred from Mariposa County to Stanislaus County, where mother and father relocated.

On April 13, 2021, the court held a 12-month status review hearing. The status review report documented an incident of domestic violence between mother and father which had occurred in front of the children during a Christmas visit. During the incident, father kicked mother in the stomach during an argument, took some clothes, and then left. The agency suspended mother and father's visitation pending an investigation.

The report further noted that after returning to her biological father's home, J.A. no longer wanted to have phone or video visits with mother and father. J.A. had also began having nightmares since her most recent visit with them. H.P. suddenly began declining to talk to her biological father, T.P. She disclosed that father had instructed her not to talk to her biological father.

All of the children reported that mother and father were arguing over J.A.'s phone. Mother and father initially denied that anything had occurred. Mother also failed to disclose any history of domestic violence between her and father during her intake interview at court-ordered domestic violence counseling.

J.A. subsequently reported that another incident of domestic violence had occurred during a visit with mother and father on Thanksgiving of 2020. During the Thanksgiving incident, father became angry with mother and threw a glass across the room. Father then locked the family out of the home while it was raining. Mother and all four children walked to a gas station where they got a ride to someone's home.

Mother admitted that an incident of domestic violence had occurred in December, but she denied any prior history of domestic violence between her and father, including the Thanksgiving incident. Mother claimed that she had separated from father.

On April 15, 2021, following a contested hearing, the juvenile court found that mother and father had not received reasonable services from Mariposa County between July and October of 2020. The court set a continued 12-month status review for July 2021.

On July 23, 2021, service logs were filed with the court. These reports detailed findings from the social worker assigned to the family's case for the time period between July 12, 2021 and July 22, 2021. Contrary to the assertions of the mother and father, the service logs showed that they were still in a dating relationship, and that father had participated in five prior visits that the mother had with J.A. However, J.A. told mother that she did not want to see father during their visits. The social worker's report further indicated that father was currently homeless and was living in a tent by the lake.

On July 27, 2021, mother and father were given 90 days to complete additional reunification services, based upon the juvenile court's prior finding that a lack of reasonable services had been provided. Service log reports following this date showed that father had missed his last three phone visits with H.P.

On October 6, 2021, an 18-month review hearing addendum was filed with the juvenile court. According to the report, father refused to do a drug test in August of 2021. He also missed three consecutive visits with the children, and discontinued court-ordered counseling services with Sierra Vista Child and Family Services in September of 2021.

Mother tested positive for methamphetamine and amphetamine following a hair follicle test in September of 2021. Although mother denied ingesting methamphetamine since May of 2021, she tested positive for methamphetamine again in October of 2021

following a urinalysis. The agency recommended that reunification services be terminated as to both parents.

On November 21, 2021, father was arrested on an outstanding warrant in Idaho. Father had methamphetamine and a methamphetamine pipe on his person. Mother, who was in Idaho for a scheduled visit with H.P., was present when father was arrested.

Mother had an order of protection against father. The following day, a social worker called father's phone. Mother answered. When questioned about why she was with father, mother claimed that she was someone named "Jenny Potter." Social services subsequently learned that father had been present for overnight visits with mother in October 2021, and that mother and father had instructed the children to lie about this if they were questioned.

### 4. Visitation Orders

On December 10, 2021, the court terminated reunification services as to mother and father and set a 366.26 hearing. The boys continued living with their maternal grandparents, and mother continued her weekly supervised visits with the boys.

On September 13, 2022, the juvenile court ordered that mother was to have weekly unsupervised visits in the community for two to four hours. Father was permitted to attend mother's visits.

On October 26, 2022, the boys told social services that they no longer desired to visit mother and father because they were being pressured to come home. The boys began declining their scheduled visits. They also expressed an interest in being adopted by their maternal grandparents, with whom they had been living since dependency proceedings began.

On November 7, 2022, mother filed a section 388 petition seeking to enforce the court's visitation order. The petition alleged that the "[p]revious 3 visits were canceled by attorney for minor with no make-up visits scheduled." The requested order was:

7.

"1) Regular visits to be scheduled.  2) Make-up visits to be scheduled.  3) Any visit cancellations must be made between minors and Social Worker."

On January 10, 2023, mother withdrew her section 388 petition.  The court ordered mother to notify the social worker by noon on Wednesday of plans for scheduled visits.  In turn, the boys would notify the social worker if they wished to reschedule visits, and the social worker would notify all parties of any cancellations.

On January 13, 2023, the agency filed a section 366.26 report.  The report recommended termination of parental rights and adoption by the boys' caretakers as the preferred plan.  The report stated the boys were having weekly visits with their mother at the agency last year.  They were then moved to weekly community visits and father was authorized to join them.  However, after approximately one month, the boys elected to cease visits with mother and father.

According to the report, only one visit had occurred after the juvenile court's September 27, 2022 visitation order.  This visit occurred on October 2, 2022, at a movie theater in Tracy.  Following that visit, mother failed to confirm plans on one occasion and the boys declined to participate in the remainder of the scheduled visits.

On February 22, 2023, a bonding study was conducted by Dr. Cheryl K. Carmichael, a licensed psychologist.  Dr. Carmichael opined that there had not been a parent/child relationship between the boys and their parents for more than three years.  Dr. Carmichael explained, "[t]he parents were so consumed with drugs and antagonistic in their relationship that support of the children took a back seat."

5.      **Termination of Parental Rights**

On March 2, 2023, mother was present in court.  Father was absent but represented by counsel.  A date was set for the contested section 366.26 hearing.  Counsel for the minors requested that the boys not be asked if they want to go to weekly visits with mother because this was causing them distress.  The court declined to make any temporary orders as the 366.26 hearing was scheduled to occur soon.

On May 18, 2023, both parents were present in court for the 366.26 hearing. Following argument by the parties, the juvenile court found the boys were likely to be adopted and that no exceptions applied. (See § 366.26, subd. (c)(1)(B)(i)-(vi), (4)(A).) The court terminated mother's and father's parental rights.

A timely notice of appeal by mother and father followed.

## DISCUSSION

### I. The Agency's Duty of Further Inquiry Under ICWA

Mother and father claim the agency failed to satisfy their duty of further inquiry under ICWA, which was triggered by maternal grandfather's disclosure of possible Indian heritage in the Cherokee Nation. We agree. The record lacks substantial evidence that the agency complied with its duty of further inquiry under ICWA, and the court abused its discretion in concluding otherwise. We will therefore remand this matter back to the juvenile court for further proceedings.

### A. Background: Facts Relevant to ICWA

On December 27, 2019, when questioned by a social worker, mother and father denied any Indian heritage. Their ICWA-010(A) forms, which were completed on this date, show that the boxes indicating A.P. and T.P. have "no known Indian ancestry" were checked.

On January 2, 2020, the Mariposa County Superior Court found that ICWA did not apply to A.P., T.P., or J.A., but found that it may apply to H.P. The agency later received information that ICWA may apply to J.A. Notice was sent to all Sioux Indian Tribes. H.P.'s biological father represented that his father is an enrolled member of the Southern Band of the Western Shoshone tribe. Notice was sent to the Shoshone tribes. The agency requested Dr. Karen Wynn, an ICWA expert witness, complete a report regarding the potential Indian heritage of J.A. and H.P.

On March 24, 2020, the declaration of an ICWA qualified expert witness was provided by Dr. Wynn regarding all four children. Since mother and father had reported

9.

they were not American Indian, Dr. Wynn concluded that ICWA did not apply to A.P. and T.P, their biological children together. With respect to J.A. and H.P., Dr. Wynn explained that due to blood quantum requirements, the relevant tribes had determined that neither J.A. nor H.P. were eligible for enrollment, and therefore, ICWA did not apply to them. Dr. Wynn stated that the agency was nonetheless providing services to the family with respect to J.A. and H.P. "under the *Spirit of ICWA*."

On April 22, 2020, the juvenile court found that ICWA did not apply to J.A. and H.P.

On September 22, 2020, when the case was received by Stanislaus County, mother and father completed individual Parental Notifications of Indian Status forms (ICWA-020). Mother and father both checked the box stating: "I have no Indian ancestry as far as I know."

On April 5, 2023, the boys' maternal grandfather, with whom they were placed, disclosed possible Indian ancestry.[5]

On April 6, 2023, the juvenile court referenced maternal grandfather's statement concerning possible Cherokee heritage. The court further stated that mother's counsel had learned from mother that there may be Native American ancestry on both sides of the family. The court set aside its prior finding that ICWA did not apply to the boys and found there was reason to believe that the children had Native American ancestry.

On May 12, 2023, the agency submitted an ICWA compliance report. The agency recommended the court find that ICWA did not apply as to A.P. and T.P. The agency furnished the following information detailing its investigation:

On April 5, 2023, the agency contacted the boys' maternal grandfather. He reported his "paternal great great grandfather" was a member of the Cherokee Nation.

---

[5] J.A. and H.P. were not subjects of further ICWA inquires as they were placed with their respective biological fathers.

However, maternal grandfather was not registered as a member of the tribe because his great-grandmother had passed before she was able to register her children.  Maternal grandfather also described seeing a photograph supporting his claim of the family's Indian ancestry, and stated that he would make contact with his father for more information.

On April 7, 2023, the agency received an email from a representative of the Cherokee Nation stating that the boys were not Indian children in relation to the Cherokee Nation.  A copy of the email correspondence was not made part of the agency's report.  However, the social worker stated that the representative explained that Cherokee Nation heritage is determined through direct biological lineage only.  Extended collateral relatives, such as aunt and uncles, would not be used and unknown relatives are not researched.

On April 10, 2023, the boys' maternal grandfather stated that he had spoken to his father about their possible Indian heritage.  Maternal grandfather clarified that he is "under 1%" which does not allow them to be enrolled to the Cherokee Nation tribe.  Maternal grandfather further stated that the picture he had previously mentioned was of someone he saw as a child and his family would jokingly state that the man in the photograph was his grandfather, but it was not.  He stated that his grandsons were not eligible for any Native American tribe.

On May 8, 2023, mother was contacted regarding her attorney's claim that mother may have Native American ancestry.  Mother stated that based on her knowledge, ICWA was already proven not to apply.  However, she directed the agency to her mother for further information.

On May 8, 2023, the agency contacted maternal grandmother.  Maternal grandmother stated that "It was reported that there may be Cherokee Nation Ancestry in Oklahoma but based [on] her knowledge it was never proven to be true."  The agency attempted to contact both maternal great-grandfathers but was unable to reach them and

11.

no return call was received. (*Ibid*.) The agency also made attempts to contact a maternal great-grandmother, three maternal great-uncles and a maternal cousin once removed. In each of these cases, a message was left but no return call was received.

A paternal great-aunt indicated that there was no Native American ancestry in the family. There was family lore of Cherokee Nation ancestry, but it was determined there was no detectable Native American DNA. A message was left for a second paternal great-aunt, but no return call was received. The agency attempted to contact seven more paternal great relatives, without success. And at least five other paternal relatives were unable to be reached based upon the contact information provided.

A paternal great uncle stated that his father had explained to him that they did not have enough Native American DNA to qualify for enrollment in any tribes. And, a paternal aunt stated that based upon her knowledge, there was no Native American ancestry. She referred the social worker to a paternal great aunt for more information, but this individual had already confirmed no Native American ancestry.

The agency's report concluded that no family members had come forward with information supplying the agency with a reason to believe or a reason to know that the boys are Indian children.

On May 18, 2023, at the contested 366.26 hearing, the juvenile court stated that it had reviewed the ICWA compliance report. The court concluded, "[h]aving reviewed the compliance report filed on May 12th, I do find that the Agency has completed their investigation and are compliant with Welfare & Institutions Code section 224.2, and that based on the efforts, that the Indian Child Welfare Act does not apply to these minors."

**B.     Relevant Legal Principles**

One of the primary purposes of ICWA is "to protect 'Indian children who are members of or are eligible for membership in an Indian tribe.' " (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) To this end, ICWA establishes the minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child

12.

from his or her family. (25 U.S.C. § 1902; see *In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8.) In any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe ... have a right to intervene" (25 U.S.C. § 1911(c)) and may petition the court to invalidate an order terminating parental rights over an Indian child made in violation of ICWA (25 U.S.C. § 1914; see § 224.2, subd. (e)).

ICWA defines an " 'Indian child' " as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903 (4).) The juvenile court and the agency have an affirmative and continuing duty, beginning at initial contact, to inquire whether a child who is subject to the proceedings is, or may be, an Indian child. (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a)(2)(c).) " 'This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice.' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 402.)

The initial duty of inquiry "begins with the initial contact." (§ 224.2, subd. (a).) The juvenile court and the agency must ask all participants in a dependency proceeding upon each party's first appearance whether the participant knows or has reason to know that the child is an Indian child and order the parent/parents to complete a Parental Notification of Indian Status (ICWA-020 form). (*In re Austin J.* (2020) 47 Cal.App.5th 870, 883, superseded by statute on other grounds as stated in *In re E.C.* (2022) 85 Cal.App.5th 123, 147 (*E.C.*); see also 25 C.F.R. § 23.107(a); § 224.2, subd. (c); Cal. Rules of Court, rule 5.481(a)(2)(C).)

If a child has been placed into the temporary custody of a county welfare department, the initial duty to inquire includes asking extended family members, including uncles, aunts, cousins, and grandparents, about whether the child is, or may be, an Indian child. (§ 224.2, subd. (b).) Extended family members include adults who are

13.

the child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

A statutory duty of further inquiry arises if the agency or the juvenile court has "reason to believe" the proceedings involve an Indian child but "does not have sufficient information to determine that there is reason to know that the child is an Indian child." (§ 224.2, subd. (e)). A "reason to believe" exists when the juvenile court or the agency "has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (*Id.*, subd. (e)(1).)

When there is a reason to believe a child is an Indian child, as in this case, the agency must satisfy three requirements. First, the agency must interview the child's parents, Indian custodian, if any, and extended family members to gather relevant information regarding the details of the child's birth, family members, and possible tribal affiliations. (§ 224.2, subd. (e)(2)(A).) Second, the agency must contact "the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member, or eligible for membership in, and contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility." (*Id.*, subd. (e)(2)(B).) Third, the agency must contact "the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (*Id.*, subd. (e)(2)(C).) The agency's contact with the tribe "shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (*Ibid.*)

The final duty arises if the court or the agency has " 'reason to know' " the child is an Indian child. (*In re D.F.* (2020) 55 Cal.App.5th 558, 567.) A "reason to know" exists if one of the following circumstances is present: "(1) A person having an interest in the

14.

child ... informs the court that the child is an Indian child[;] [¶] (2) The residence ... of the child [or] the child's parents ... is on a reservation or in an Alaska Native village[;] [¶] (3) Any participant in the proceeding ... informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child ... gives the court reason to know that the child is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[;] [or] [¶] (6) The court is informed that either parent or the child possess[es] an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d)(1)-(6).)

### C.   Standard of Review

"The juvenile court's finding that ICWA does not apply to the proceeding rests on two elemental determinations, 'subject to reversal based on sufficiency of the evidence.' " (*In re K.H.* (2022) 84 Cal.App.5th 566, 601 (*K.H.*), quoting § 224.2, subd. (i)(2).) First, "[t]he court must find there is 'no reason to know whether the child is an Indian child,' which is dependent upon whether any of the six circumstances set forth in subdivision (d) of section 224.2 apply." (*K.H.*, at p. 601, quoting § 224.2, subd. (i)(2).) Second, "[t]he juvenile court must ... find a 'proper and adequate further inquiry and due diligence.' " (*K.H.*, at p. 601, quoting § 224.2, subd. (i)(2).)

As sufficiency of the evidence is essentially a factual inquiry, we review the record for substantial evidence. (*K.H., supra,* 84 Cal.App.5th at p. 601; *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1004 (*Ezequiel G.*); *In re J.K.* (2022) 83 Cal.App.5th 498, 504.) Under this standard, " 'a reviewing court should "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." [Citation.] The determinations should "be upheld if ... supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." ' [Citations.] The standard recognizes that '[t]rial courts "generally are in a better

15.

position to evaluate and weigh the evidence" than appellate courts' [citation], and 'an appellate court should accept a trial court's factual findings if they are reasonable and supported by substantial evidence in the record' [citation]. '[I]f a court holds an evidentiary hearing, it may make credibility determinations, to which an appellate court would generally defer.' " (*K.H.,* at p. 601.)

The juvenile court's finding on the second element of whether a "proper and adequate further inquiry and due diligence" (§ 224.2, subd. (i)(2)) occurred is reviewed under a hybrid standard. (*K.H., supra*, 84 Cal.App.5th at p. 601; *Ezequiel G., supra,* 81 Cal.App.5th at pp. 1004-1005.) "The inquiry is ultimately discretionary because it requires the juvenile court to 'engage in a delicate balancing of' various factors in assessing whether the agency's inquiry was proper and adequate within the context of ICWA and California law, and whether the agency acted with due diligence." (*K.H.,* at p. 601, quoting *In re Caden C.* (2021) 11 Cal.5th 614, 640 (*Caden C.*); accord, *Ezequiel G.,* at p. 999.) We therefore review the juvenile court's determination for substantial evidence and an abuse of discretion. (*K.H.,* at p. 601.)

"Review of the juvenile court's findings under the foregoing standards is deferential, but ' "an appellate court [nevertheless] exercises its independent judgment to determine whether the facts satisfy the rule of law." ' [Citations.] Where the material facts are undisputed, courts have applied independent review to determine whether ICWA's requirements were satisfied." (*K.H., supra*, 84 Cal.App.5th at p. 602.)

### D. Analysis

#### 1. *The Duty of Further Inquiry Was Not Satisfied*

The parties agree that maternal grandfather's disclosure of possible distant Indian ancestry was sufficient to give the agency a "reason to believe" that the boys may be Indian children. Although maternal grandfather subsequently clarified that his belief was based upon incorrect information, his initial disclosure nonetheless triggered the agency's

duty of further inquiry under ICWA. We conclude that the agency's inquiry was insufficient for three reasons.

First, the agency never attempted to contact the Bureau of Indian Affairs (BIA) for assistance in identifying the names and contact information of the tribes to which the boys may qualify for membership. (See § 224.2, subd. (e)(2)(B).) The agency does not dispute this assertion. Based upon the available record, it appears that the agency assumed that the boys could only potentially claim membership to the Cherokee Nation, to the exclusion of other federally recognized Cherokee tribes. The BIA should have been given the opportunity to make this determination.

Second, although maternal grandfather later clarified that he has less than one percent Cherokee DNA, and therefore, does not qualify for membership in the Cherokee Nation, the tribe alone determines its qualification for membership. (See *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 72, fn. 32 ["A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community"].) Thus, maternal grandfather's subsequent disclosure that he does not qualify as a member of the Cherokee Nation did not absolve the agency of its duty of further inquiry under ICWA.

Finally, although the agency contacted the Cherokee Nation to inquire about the boys' possible membership in the Cherokee Nation, the record lacks sufficient assurances that the agency's inquiry was sufficient. The contents of the Cherokee Nation's email were briefly described in the agency's compliance report, but the email correspondence between the agency and the Cherokee Nation's representative were not made part of the record. Although the Cherokee Nation represented that the boys were not Indian children, its determination was "based on the information exactly as provided. Any incorrect or omitted information could invalidate this determination." To ensure that the Cherokee Nation's conclusion was based upon complete and accurate information, the

17.

agency should have included a copy of this email correspondence within its compliance report.

### 2. *Prejudice*

"Where, as here, the deficiency lies with [the] agency's duty of ... inquiry and a juvenile court's related finding of 'proper and adequate further inquiry and due diligence' (§ 224.2, subd. (i)(2)), the error is one of state law ([*In re*] *Benjamin M.* [(2021)] 70 Cal.App.5th [735,] 742). Under the California Constitution, '[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*K.H.*, *supra*, 84 Cal.App.5th at p. 606; accord, *E.C.*, *supra*, 85 Cal.App.5th at p. 151.)

" '[T]o be entitled to relief on appeal from an alleged abuse of discretion, it must clearly appear the resulting injury is sufficiently grave to manifest a miscarriage of justice' [citations], and California law generally interprets its constitutional miscarriage of justice requirement 'as permitting reversal only if the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but for the error.' " (*K.H., supra*, 84 Cal.App.5th at pp. 606-607; accord, *E.C., supra*, 85 Cal.App.5th at pp. 151-152.)

Our Supreme Court has "recognized that while we *generally* apply a *Watson*[6] likelihood-of-success test to assess prejudice, a merits-based outcome-focused test is not *always* appropriate because it cannot always adequately measure the relevant harm. [Citation.] In other words, where the injury caused by the error is unrelated to an outcome on the merits, tethering the showing of prejudice to such an outcome misplaces

---

[6] *People v. Watson* (1956) 46 Cal.2d 818, 836.

the measure, at the expense of the rights the law in question was designed to protect." (*K.H., supra*, 84 Cal.App.5th at p. 609, discussing *In re A.R.* (2021) 11 Cal.5th 234, 252-254.)

" 'ICWA compliance presents a unique situation.' " (*K.H., supra*, 84 Cal.App.5th at p. 608.) "ICWA is not directed at reaching, or protecting, a specific outcome on the merits." (*Id*. at p. 609; accord, *E.C., supra*, 85 Cal.App.5th at p. 154.) Rather, " '[t]he purpose of ICWA and related California statutes is to provide notice to the tribe sufficient to allow it to determine whether the child is an Indian child, and whether the tribe wishes to intervene in the proceedings' [citations], and an adequate initial inquiry facilitates the information gathering upon which the court's ICWA determination will rest." (*K.H.*, at p. 608; accord, *E.C.*, at pp. 152-153.) Yet, "while the appealing party is usually a parent, parents do not bear the burden of gathering information in compliance with ICWA [citations], and parents may raise the claim of error for the first time on appeal." (*K.H.*, at p. 608.)

Further, the ultimate determination whether a child is an Indian child rests with the tribe, not with a parent, the department, or the juvenile court. (*K.H., supra*, 84 Cal.App.5th at p. 590; accord, *E.C., supra*, 85 Cal.App.5th at pp. 139- 140.) "[W]here the opportunity to gather the relevant information critical to determining whether the child is or may be an Indian child is lost because there has not been adequate inquiry and due diligence, reversal for correction is generally the only effective safeguard." (*K.H.*, at p. 610, citing *In re A.R., supra,* 11 Cal.5th at pp. 252-254.)

Here, the agency's inquiry, " 'fell … short of that required to gather the information needed to meaningfully safeguard the rights of the tribes, as intended under ICWA and California law' " (*E.C., supra*, 85 Cal.App.5th at p. 156, quoting *K.H., supra*, 84 Cal.App.5th at p. 620), and "[a] finding of harmlessness on this record would necessarily require speculation and 'is at odds with the statutory protections that ICWA and California law intend to afford Indian children and Indian tribes.' " (*E.C.*, at p. 155,

quoting, *K.H.*, at p. 611.) The error is therefore prejudicial and a conditional reversal is required.

The juvenile court's finding that ICWA does not apply is conditionally reversed and the matter is remanded back to the juvenile court for further proceedings. The court is instructed to ensure the agency conducts " 'a proper, adequate, and duly diligent inquiry under section 224.2, subdivision[s] (b) [and (e)], and document its inquiry in the record in compliance with rule 5.481(a)(5).' " (*E.C., supra*, 85 Cal.App.5th at p. 157, quoting *K.H., supra*, 84 Cal.App.5th at p. 621.)

We acknowledge that maternal grandfather's and paternal great-aunt's disclosure of possible Cherokee Nation ancestry likely falls short of supplying the agency with a "reason to know" that the boys are Indian children. (See *In re A.M.* (2020) 47 Cal.App.5th 303, 322 [finding mother's statements about potential ancestry with the Blackfoot and Cherokee tribes, without more, insufficient to trigger ICWA notice provisions].) We nonetheless encourage the agency to send Notice of Involuntary Child Custody Proceedings for an Indian Child (form ICWA-030) notices, by certified mail, return receipt requested, to all required ICWA notice recipients, out of an abundance of caution. (See 25 U.S.C. § 1912(a); § 224.2, subd. (a); Cal. Rules of Court, rule 5.481, subd. (b).)

## II.    The Beneficial Parent-Child Relationship Exception to Adoption

Father further contends that the juvenile court erred by failing to enforce the visitation order, or alternatively, unliterally deciding to stop father's visits, thereby depriving him of the ability to prove the parent-benefit exception to adoption at the 366.26 hearing. We conclude that father's claim is meritless.

### A.    Background:  The Visitation Orders

On September 27, 2022, the juvenile court made its order for visitation following the termination of reunification services. The juvenile court ordered that mother was entitled to weekly visitation. Father was granted monthly visitation, but the court

permitted him to attend mother's weekly scheduled visits with the boys, provided all parties agreed.

The minute order for the September 27, 2022 hearing specifies: "Mother shall have a weekly visit which shall take place on Sunday for a period of two to four hours in duration; allowing flexibility for planned activities and the minors' cadet training. [¶] Father shall have a monthly visit under the same conditions as the mother. [¶] He may attend mother's weekly visits. [¶] Visits are unsupervised in the community with the social worker discretion to supervise. [¶] The visitation schedule shall be complied with as ordered." The revised case plan submitted by the agency after the hearing reflects this order.

On October 2, 2022, a visit between mother and the boys occurred at the Tracy movie theater. The next three visits were cancelled by the attorney for the boys, presumably at their request.

On November 7, 2022, mother filed a section 388 petition to enforce visitation. The requested order was: "1) Regular visits to be scheduled. 2) Make-up visits to be scheduled. 3) Any visit cancellations must be made between minors and Social Worker."

On January 10, 2023, a hearing was held on mother's motion to modify the visitation order. The children were present, as were mother and father, and their counsel. Following an in-chambers discussion, the juvenile court represented that an agreement had been reached permitting visitation to "continue to be scheduled," and that mother would "advise social worker … by noon Wednesday of the plans for the visit, and then the social worker will let the parties and children know." And, if the boys sought to cancel scheduled visits, they would notify the social worker. Mother withdrew her section 388 petition.

Father never raised an issue regarding visitation.

On March 2, 2023, counsel for the boys represented that they did not want to visit either mother or father and asked the court to change the order so they would not have to

21.

be asked if they wanted to visit every week.  Reiterating their desire not to visit mother and father was causing them distress.  The court declined to make any temporary orders in view of the 366.26 hearing.

### B.    Applicable Law and Standard of Review

We summarized the applicable law as set forth in *In re Eli B.* (2022) 73 Cal.App.5th 1061 (*Eli B.*):

"The beneficial relationship test is an exception to the presumptive rule of terminating parental rights after reunification efforts have failed, in order to free a child for adoption.  (*In re J.D.* (2021) 70 Cal.App.5th 833, 852 (*J.D.*).)  The Supreme Court has recently explained its scope and proper application.  (See generally *Caden C., supra*, 11 Cal.5th 614.)

As clarified by the Supreme Court, " 'the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home.  When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption.' " (*J.D., supra*, 70 Cal.App.5th at p. 852, quoting *Caden C., supra*, 11 Cal.5th at pp. 636-637.)

"We review the juvenile court's ruling on the first two elements for substantial evidence.  (*J.D., supra*, 70 Cal.App.5th at p. 853.)  We review its ruling on the third element under a hybrid standard, reviewing its factual determinations concerning the detriment analysis for substantial evidence but its ultimate weighing of the relative harms

22.

and benefits of terminating parental rights for an abuse of discretion." (*Eli B.*, *supra*, 73 Cal.App.5th at p. 1068.)

Under the substantial evidence standard, "we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court." (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 865.) We do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' " (*Caden C., supra*, 11 Cal.5th at p. 640.) We uphold the juvenile court's findings if they are " 'supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Ibid*.) In reviewing for abuse of discretion, we reverse "only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

## C.  Analysis

Preliminarily, we observe that father never raised an issue with respect to the visitation order below. After the boys began refusing visits with mother and father, mother filed a section 388 petition seeking to enforce the court's order for visitation, but father did not. Nor did father ask the court informally to revisit the visitation order. He therefore waived any right to complain of any prejudicial effect of this issue, and more specifically, the boys' refusal to comply with the visitation order, on appeal.

"When a child refuses visitation, it is the parent's burden to request a specific type of enforcement, or a specific change to the visitation order. Absent a request, it is not the court's burden to sua sponte come up with a solution to the intractable problem of a child's steadfast refusal to visit a parent. Trial judges are not mental health experts, nor child behavior experts. …  '[D]ependency courts "simply do not have the time and resources to constantly fine tune an order in response to the progress or lack thereof in the

23.

visitation arrangement, or in reaction to physical or psychological conduct which may threaten the child's well-being." ' (*In re Julie M.* [(1999)] 69 Cal.App.4th [41,] 51.) Those sorts of changes are better handled, in the first instance, through communication with [the agency], and, as needed, through motions to modify the visitation order. It is the parent's burden to initiate those procedures, not the court's." (*In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1046.)

Relying upon *In re Hunter S.* (2006) 142 Cal.App.4th 1497 (*Hunter S.*), father nonetheless insists that the juvenile court erred by failing to enforce the visitation order. There, a five-year-old child was detained and placed with a relative while the mother was incarcerated. (*Id.* at pp. 1500-1501.) After the mother was released, she entered a rehabilitation program where she attempted to maintain contact with the child by phone. The child refused to accept the mother's phone calls and stopped responding to her letters. (*Id.* at p. 1501.) The juvenile court ordered the child protective agency to set up " 'visitation for [the mother] *as can be arranged* through her program.' " (*Ibid.*, italics added.)

On appeal, the court concluded that the effect of the visitation order, as stated, would give the child "virtually complete discretion to veto visitation, and indeed all contact, with his mother, a discretion he exercised without any oversight or direction by the court." (*Hunter S., supra*, 142 Cal.App.4th at p. 1505.) The appellate court explained that the "juvenile court cannot impermissibly delegate to the child's therapist, [the child protective agency] or any third person, unlimited discretion to determine whether visitation is to occur." (*Ibid.*)

Here, father had a specific, enforceable visitation schedule, in contrast to " 'as can be arranged' " visitation. (See *Hunter S., supra*, 142 Cal.App.4th at p. 1501.) That alone distinguishes the instant case from *Hunter S.*, because only the parties who were subject to the order were vested with the discretion to decide whether visits would occur.

We acknowledge that some of the language in *Hunter S.* supports the conclusion that the juvenile court errs where the child refuses to comply with a proper visitation order. (See *Hunter S., supra,* 142 Cal.App.4th at p. 1505.) We disagree with *Hunter S.* on this point and decline to adopt a similar conclusion.

As *In re Sofia M.*, *supra*, 24 Cal.App.5th at page 1046 explained, *Hunter S.* "risks conflating two distinct issues: the propriety of the order, and its enforcement. Further, it suggests that the *court* errs when the *child* refuses a proper visitation order. To the extent *Hunter [S.]* stands for those propositions, we disagree. The court does not err by failing to do that which it is not requested to do."

Here, father requested no enforcement mechanism of the visitation order. Yet, he attempts to place blame on the juvenile court for failing to take action sua sponte to enforce that order. For the reasons discussed, it was not the juvenile court's responsibility. Assuming however that father could show error, the record does not support the conclusion that father could show the parent-child exception to adoption applied.

"The reality in many of these cases is that the parent has irreparably damaged the relationship beyond salvage." (*In re Sofia M.*, *supra*, 24 Cal.App.5th at p. 1047.) The instant case is no exception. The record shows that mother and father grappled with addiction, and the children observed multiple incidents of domestic violence between them. In her bonding study, Dr. Carmichael opined that there had not been a parent/child relationship between the boys and their parents *for more than three years*. She explained, "[t]he parents were so consumed with drugs and antagonistic in their relationship that support of the children took a back seat."

Even if children had continued visitation with mother and father, nothing upon the instant record supports the conclusion that they could have demonstrated the beneficial parental relationship exception applied. Father's assertions to the contrary are purely speculative.

**DISPOSITION**

The juvenile court's finding that ICWA does not apply is conditionally reversed, and the matter is remanded to the juvenile court with directions to order the agency to comply with the inquiry and documentation provisions set forth in section 224.2, subdivisions (b) and (e), and California Rules of Court, rule 5.481(a)(5). If, after determining that an adequate inquiry was made consistent with the reasoning in this opinion, the court finds that ICWA applies, the court shall vacate its existing order and proceed in compliance with ICWA and related California law. If the court instead finds that ICWA does not apply, its ICWA finding shall be reinstated. In all other respects, the juvenile court's order is affirmed.

SMITH, J.

WE CONCUR:


DETJEN, Acting P. J.


FRANSON, J.